UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

TRUSTEES OF THE MOSAIC AND
TERRAZZO WELFARE, PENSION,
ANNUITY AND VACATION FUNDS, and
TRUSTEES OF THE BRICKLAYERS &
TROWEL TRADES INTERNATIONAL
PENSION FUND,

                Plaintiffs,

    - against -

HIGH PERFORMANCE FLOORS, INC., a
New York Corporation, HIGH
PERFORMANCE FLOORS, INC., a New
Jersey Corporation, HPF, INC., 2 MAIN
STREET, L.L.C, and 40 PARK PLACE LLC,

                Defendants.
--------------------------------------------------------X

MEMORANDUM &
ORDER
15-CV-2253 (SMG)

GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

       Plaintiffs, Trustees of the Mosaic and Terrazzo Welfare, Pension, Annuity and Vacation

Funds and Trustees of the Bricklayers & Trowel Trades International Pension Fund (the

"Funds"), bring this action pursuant to Section 502(a)(3) of the Employee Retirement Income

Security Act of 1974 ("ERISA"), as amended 29 U.S.C. § 1132(a)(3), and Section 3401 of the

Labor Management Relations Act of 1947 ("LMRA"), as amended 29 U.S.C. § 185. Plaintiffs

seek to collect employer contributions they contend are owed to a group of employee benefit

funds for covered work performed by employees of defendant HPF, Inc. ("HPF").

       Defendants High Performance Floors, Inc., a New Jersey corporation, and High

Performance Floors, Inc., a New York corporation (collectively "High Performance"), are

signatories to a collective bargaining agreement (the "CBA") that requires contributions to the

plaintiff Funds. Plaintiffs contend that HPF is an alter ego of, or single employer with, High Performance, that the labor performed by HPF is as a result governed by the CBA, and that contributions to the Funds are therefore due and owing for the covered work performed by HPF employees.

The parties consented to the assignment of this case to a magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Docket Entry 34. A non-jury trial limited to the question of liability was held over the course of three days in October 2016. The Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 are set forth in narrative form below. *See* 9 *Moore's Federal Practice* § 52.13[1].

## FACTUAL BACKGROUND

Plaintiffs are trustees of the Mosaic and Terrazzo Welfare, Pension, Annuity and Vacation Funds and the Bricklayers and Trowel Trades International Pension Fund. Compl. ¶¶ 4-5, Docket Entry 1. These funds were established pursuant to the terms of collective bargaining agreements entered into between the Mosaic, Terrazzo and Chemical Product Decorative Finisher Masons Workers Association Local No. 7 of New York, New Jersey & Vicinity ("Local 7") and various employers. Compl. ¶ 14. Local 7 is a union whose members are tile, marble, and terrazzo workers. Tr. 34:14-16.[1]

Guy Balzano, the principal of High Performance, founded the company in December 1991. Tr. 361:5-9. High Performance is in the business of floor installation, and its primary contract is with Stonhard, Inc. ("Stonhard"), a resinous floor vendor that engages companies like

---

[1] "Tr." refers to the transcript of the bench trial held on October 5, 6, and 18, 2016. Docket Entries 51-53.

High Performance to install its products.  Tr. 361:10-362:9.  High Performance is a signatory to the CBA that requires contributions to the plaintiff Funds for covered work.

The CBA defines covered work as, among other things, various types of tile, ceramic, and resinous flooring installation performed in specified counties of New York and New Jersey. Pls.' Trial Ex. V, at Arts. II and IV.  A schedule attached to the CBA provides that, at least from 2009-2010, employers who are signatories were required to contribute $28.06 per hour of covered work to the plaintiff Funds.[2]  Pls.' Trial Ex. V, at 31-32.  Balzano testified that he understood the CBA to require benefit fund contributions for all covered work performed by High Performance, regardless of whether the owner or general contractor for a particular job required that the work be performed with union labor.  Tr. 383:6-384:9.

The principal of defendant HPF, at least in name, is Harold Sofield, who opened the company in May of 2012.  Tr. 233:8-16.  HPF is not a signatory to the CBA.  Plaintiffs, though, contend that HPF was in fact formed by Balzano as a vehicle for performing covered work for owners or general contractors who did not require union labor, without making the benefit fund contributions that would otherwise be required by the CBA.  Plaintiffs further argue that High Performance and HPF are alter egos and constitute a single employer, and that they are as a result jointly and severally liable to pay contributions for covered work, even if that work was performed through HPF.

---

[2] The CBA received in evidence covers July 1, 2009 through June 30, 2013, but an attached schedule provides hourly rate information only through 2010.  As noted above, the issue at trial was limited to whether defendants are liable for covered work performed by HPF, with the amount of any contributions due for that work, if any, to be determined in a separate proceeding.

LEGAL STANDARDS

## I.    Alter Ego Liability

The alter ego doctrine "is designed to defeat attempts to avoid a company's union obligations through a sham transaction or technical change in operations." *Local One, Amalgamated Lithographers of Am. v. Stearns & Beale, Inc.*, 812 F.2d 763, 772 (2d Cir. 1987). If entities are determined to be alter egos of each other, "'then each is bound by the collective bargaining agreements signed by the other,' and 'thereby obligated to honor the pension [and welfare benefit] contributions terms' of the agreement." *Plumbers, Pipefitters and Apprentices Local Union No. 112 Pension, Health and Educational and Apprenticeship Plans v. Mauro's Plumbing, Heating and Fire Suppression, Inc.* ("*Mauro's Plumbing*"), 84 F. Supp. 2d 344, 349 (N.D.N.Y. 2000) (quoting *Lihli Fashions Corp., Inc. v. N.L.R.B.*, 80 F.3d 743, 748 (2d Cir. 1996)). To determine whether two companies are alter egos, courts "focus[] on commonality of (i) management, (ii) business purpose, (iii) operations, (iv) equipment, (v) customers, and (vi) supervision and ownership" between the subject entities. *N.Y. State Teamsters Conference Pens. & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 649 (2d Cir. 2005), (quoting *Newspaper Guild of N.Y. v. N.L.R.B.*, 261 F.3d 291, 294 (2d Cir. 2001)); *see also Local One Amalgamated Lithographers of Am.*, 812 F.2d at 772.

## II.    Single Employer Liability

### A.  Single Employer

The N.L.R.B. developed the single employer doctrine, "which treats two nominally independent enterprises as a single employer, in order to protect the collective bargaining rights of employees." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996). An entity that has signed a CBA and one that has not will be held jointly and severally liable for the signatory's obligations

4

under the CBA if the single employer test is satisfied and the two entities "together [] represent an appropriate employee bargaining unit." *Lihli Fashions Corp.*, 80 F.3d at 747.

The alter ego and single employer doctrines "are 'conceptually distinct.'  The focus of the alter ego doctrine, unlike that of the single employer doctrine, is on 'the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or technical change in operations.'" *Lihli Fashions Corp.*, 80 F.3d at 748.  The single employer doctrine, in contrast, focuses on determining if the entities "are part of a single integrated enterprise," and is "characterized by absence of an arm's length relationship found among unintegrated companies." *Id.* at 747 (internal quotation marks omitted).

Whether two entities constitute a "single employer" is determined by four factors enumerated by the Supreme Court: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *United Union of Roofers, Waterproofers, Allied Workers, Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.* ("*United Union of Roofers*"), 2012 WL 4092598, at *9 (W.D.N.Y. Sept. 10, 2012) (citing *Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam)).  *See also South Prairie Constr. v. Local No. 627, Intern. Union of Operating Eng'rs, AFL-CIO*, 425 U.S. 800, 802-803 (1976) (per curiam)).  The Second Circuit has held that two additional factors are properly considered as well: (5) use of common office facilities and equipment and (6) family connections between or among the various enterprises. *United Union of Roofers, Waterproofers, and Allied Workers Local No. 210, AFL-CIO v. A.W. Farrell & Son, Inc.* ("*A.W. Farrell & Son, Inc.*"), 547 Fed. Appx. 17, 19 (2d Cir. 2013) (quoting *Lihli Fashions Corp.*, 80 F.3d at 747).

"Ultimately, single employer status depends on all the circumstances of the case;" no one factor is dispositive and not all factors must be present. *Lihli Fashions Corp.*, 80 F.3d at 747 (quoting *N.L.R.B. v. Al Bryant, Inc.*, 711 F.2d 543, 551 (3d Cir. 1983)). Control of labor relations, however, is "central." *A.W. Farrell & Son, Inc.*, 547 Fed. Appx. at 19 (quoting *Murray*, 74 F.3d at 404). *See also Trs. of Empire State Carpenters v. Dykeman Carpentry, Inc.*, 2014 WL 976822, at *3 (E.D.N.Y. Mar. 12, 2014).

B.  *Single Bargaining Unit*

A finding that two entities constitute a single employer is a necessary but not a sufficient condition for imposing joint and several liability. In addition, the employees of the two entities must constitute a single bargaining unit. *See Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001); *Lihli Fashions Corp.*, 80 F.3d at 747-748; *Local One Amalgamated Lithographers of Am.*, 812 F.2d at 769.

When analyzing whether the employees of two different entities constitute a single bargaining unit, consideration "shifts from the control, structure and ownership of the employer to the community of interests of the employees." *Ferrara v. Oakfield Leasing Inc.*, 904 F. Supp. 2d 249, 264 (E.D.N.Y. 2012) (quoting *Cuyahoga Wrecking Corp. v. Laborers Int'l Union of North Am., Local Union # 210*, 644 F. Supp. 878, 882 (W.D.N.Y. 1986)). Courts "look for a 'community of interests' among the relevant employees, and 'factors such as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function and degree of employee interchange.'" *Sandimo Materials*, 250 F.3d at 128 n.2 (citations omitted).

Courts in this district have found that employees comprise a single bargaining unit where the "contributions sought [were] for the same job classification . . . and for the same type of

work," *Bourgal v. Robco Contracting Enterprises, Ltd.*, 969 F. Supp. 854, 863 (E.D.N.Y. 1997), and where that same type of work is performed in the same geographical area, *Ferrara*, 904 F. Supp. 2d at 264. A single appropriate bargaining unit may also be found where "the companies exchanged employees, the working conditions were the same at both companies, and the employees performed the same job" at both companies. *LaBarbera v. C. Volante Corp.*, 164 F. Supp. 2d 321, 326 (E.D.N.Y. 2001).

## III. Burden of Proof

Defendants argue that plaintiffs must prove the elements of alter ego and single employer status by clear and convincing evidence, because each in essence involves an allegation of fraud. Defendants' Pretrial Memorandum ("Defs.' Mem.") at 7-9, Docket Entry 42. While defendants concede they have uncovered no Second Circuit case law on the issue, they rely upon a decision of the Third Circuit holding that because "alter ego is akin to and has elements of fraud," it "must be shown by clear and convincing evidence." *See Kaplan v. First Options*, 19 F.3d 1503, 1522 (3d Cir. 1994). *See also Trustees of Nat. Elevator Industry Pension, Health Benefit and Educational Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (quoting *Kaplan*, 19 F.3d at 1522).[3]

The precedents on which defendants rely are at least arguably distinguishable, because each involves the more commonplace question of whether a court should "pierce the corporate veil" and hold an individual accountable for the debts of a corporation. Although similar, the alter ego doctrine invoked by plaintiffs here differs from traditional "veil-piercing" analysis in

---

[3] The parties rely on precedent primarily from New York and New Jersey state and federal courts. While the CBA does not contain a choice of law provision, it covers work performed in New York and New Jersey. As is apparent from the analysis set forth in the text below, there is no material difference on the facts of this case in the precedents from the various jurisdictions invoked by the parties.

that it revolves around the avoidance of obligations imposed by a CBA. *See Ret. Plan of the UNITE HERE Nat'l Ret. Fund v. Kombassan Holdings A.S.*, 629 F.3d 282, 288 (2d Cir. 2010).

Moreover, precedent from within the Second Circuit suggests that only a preponderance of the evidence is required to establish alter ego or single employer status. In one case involving defendants alleged to be both alter egos and a single employer for the purposes of evading union obligations, a bench trial was held and the court, in rejecting single employer liability, noted that "plaintiffs have failed to establish *by a preponderance of the evidence* that RCS is the alter ego of AWF, or that AWF and RCS constitute a single employer." *United Union of Roofers*, 2012 WL 4092598, at *16 (emphasis added). The Second Circuit affirmed, noting in dicta that, "plaintiffs do not dispute that they bore the [preponderance of the evidence] burden of proof at trial." *A.W. Farrell & Son, Inc.*, 547 Fed. App'x. at n.2.

Were I required to decide, I would conclude that plaintiffs may establish alter ego or single employer status by a preponderance of the evidence. I reach this conclusion because the public policy concerns underlying ERISA are substantial, leading courts to adopt a "test of alter ego status [that] is flexible, allowing courts to weigh the circumstances of the individual case." *Gesualdi v. Juda Constr., Ltd.*, 2011 WL 5075438, at *8, (S.D.N.Y. Oct. 25, 2011) (quoting *Kombassan Holding A.S.*, 629 F.3d at 288). This flexibility is available so that courts may "observe a general federal policy of piercing the corporate veil when necessary" to protect employee benefits. *Kombassan Holding A.S.*, 629 F.3d at 288 (quotation marks and citations omitted). Thus, "[c]ourts have without difficulty disregarded form for substance where ERISA's effectiveness would otherwise be undermined." *Lowen v. Tower Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987). Moreover, when determining either alter ego or single employer status, no one factor is dispositive, and not all factors must be present. *See Brown v. Daikin Am.*

*Inc.*, 756 F.3d 219, 227 (2d Cir. 2014) (citing *Murray*, 74 F.3d at 404 with respect to single employer); *Mauro's Plumbing*, 84 F. Supp. 2d at 351 (citing *Lihli Fashions Corp.*, 80 F.3d at 746 with respect to alter ego).

These precedents suggest that is proper to consider all of the relevant circumstances in a particular case and that strict application of a clear and convincing standard of proof would be inconsistent with the flexibility afforded to courts to ensure that obligation imposed by ERISA are not evaded. However, the burden of proof question need not be resolved here because, as discussed below, plaintiffs have met their burden under either standard.

## FACTS

Having heard and considered the evidence at trial, I now set forth my findings of fact with respect to whether High Performance and HPF are properly considered alter egos of each other and a single employer. Although alter ego and single employer status are often analyzed separately, the evidence at trial regarding the relevant factors overlaps, and I accordingly discuss them together below. *See Bourgal*, 969 F. Supp. at 863 (analyzing alter ego and single employer status together).

As a preliminary matter, I note that I found Cesar Albuquerque, a witness called by plaintiffs and a former High Performance and HPF employee who now works for an unrelated company, to be particularly credible. I found Albuquerque credible based upon his demeanor, his lack of interest in the outcome of the litigation, and the consistency between his testimony and other reliable evidence in the case. In contrast, I found much of the testimony of Balzano and Sofield not to be credible. I reach this conclusion in large part because some of their testimony was illogical and some was internally inconsistent or contradicted by other more persuasive evidence. Moreover, although some of the most sharply disputed testimony offered

9

by Sofield and Balzano could easily have been corroborated with other evidence were it true, no corroborating evidence was presented by defendants at trial.[4]

## I.     Formation of HPF

Although not explicitly enumerated by courts as an element of alter ego or single employer status, the circumstances under which HPF was formed are highly relevant. Those circumstances support plaintiffs' alter ego and single employer claims.

It is undisputed that both High Performance and HPF were Stonhard subcontractors. While some contracts for the installation of Stonhard flooring products require union labor, others do not. Defs.' Mem. at 4-5 and 12. The gist of plaintiffs' argument in this case is that Balzano formed HPF to perform non-union Stonhard work without meeting the requirements of the CBA.

Plaintiffs claim that, even before HPF was formed, Balzano attempted to flout his obligations to the Funds by performing covered work through an alter ego called Metro Floors, Inc. ("Metro Floors"). Indeed, plaintiffs commenced a prior action against High Performance and Metro Floors that was discontinued after the parties reached a settlement. *Trustees of the Mosaic and Terrazzo Welfare, Pension, Annuity, and Vacation Funds v. High Performance Floors, Inc.*, No. 11-CV-4897 (SLT) (SMG). HPF opened and was incorporated in May 2012, not long after the time that Metro Floors closed. Tr. 106:16-107:2; 233:15-16; 253:6-10. From that point forward, Stonhard jobs for owners or general contractors who did not require union labor were performed by HPF, and the workers – often, as discussed below, individuals who were also employed by High Performance – were paid through HPF. Tr. 106:20-22. HPF closed in 2015 at about the time this action was commenced. Tr. 252:15-253:8.

---

[4] The testimony of the other witnesses cited in the text was largely undisputed.

HPF was founded by Harold Sofield.  Balzano and Sofield grew up together and have been friends for more than thirty years.  Tr. 231:7-11.  Nevertheless, and despite the fact that Sofield's company would proceed to become a Stonhard subcontractor, Sofield testified that he did not consult Balzano before opening the company, and Balzano testified that he did not know that HPF would be performing Stonhard work until sometime after it began doing so.  Tr. 242:3-10; 394:20-395:6.

It is difficult to credit Sofield's testimony that he and Balzano did not discuss forming HPF before the firm was opened for several reasons.  First, of course, is that the two had a close relationship, and Sofield was apparently planning to have HPF do precisely the sort of work Balzano had been performing through High Performance for some time.  Moreover, it is undisputed that HPF was incorporated by an accountant named Steven Meglio, who was the accountant for High Performance.  Tr. 398:13-22.  While Balzano knew Meglio, Sofield did not.  Tr. 249:13-25.  Indeed, although Sofield used a different accountant for his other company – someone known to him for more than 20 years – it was Balzano's accountant who incorporated HPF.  Tr. 246:24-247:10.

The similar names of the two companies is another indication that Balzano was involved when HPF was formed.  Balzano testified that, as the principal of High Performance, he often answers his cell phone "HPF" and has been referring to High Performance by that name since 1992.  Tr. 396:3-397:14.   Balzano also acknowledged that at least one of his customers confused HPF and High Performance when issuing checks for payment.  Tr. 413:23-415:7.  When Sofield was asked how he came to name his company HPF, he offered a confusing explanation that lacked credibility.  Tr. 238:2-242:2.  Moreover, and despite the confusion caused when Sofield

named his company with an acronym regularly used by Balzano, Balzano apparently never asked his childhood friend to change the name of his newly formed business.

Based upon the evidence described above, I find that Balzano was involved in the formation of HPF and that HPF's name was selected purposefully so that the company would be perceived as connected to High Performance by Stonhard and customers seeking to have its resinous flooring products installed. This evidence supports a finding that HPF and High Performance were alter egos and functioned as a single employer.

## II.    Business Purpose

Two entities may be found to have a common business purpose when, for example, the principal work they perform is the same, particularly when that work is performed in the same geographic area. *See Bd. of Trs. of the Heat & Frost Insulators Local No. 33 Pension Fund v. D&N Insulation Co.*, 2015 WL 5121458, at *3 (D. Conn. Aug. 31, 2015); *Castaldi v. River Ave. Contracting Corp.*, 2015 WL 3929691, at *5 (S.D.N.Y. June 20, 2015); *Jacobson v. Metro. Switchboard Co*., 2007 WL 1774911, at *6 (E.D.N.Y. June 18, 2007); *Mauro's Plumbing*, 84 F. Supp. 2d at 351. Minor distinctions in the work performed are not dispositive; thus, differentiating among entities by pointing out that one performs union work and the other does not will not defeat a finding of common business purpose. *See Mauro's Plumbing*, 84 F. Supp. 2d at 350. That one entity performs a type of job or project that its alleged alter ego does not is likewise insufficient to uncouple companies with an otherwise common business purpose. *See D&N Insulation Co.*, 2015 WL 5121458, at *3, *7.

Here, High Performance and HPF installed chemical floor coverings, typically with products produced and distributed by the same commercial vendor, Stonhard. Defendants attempt to argue that HPF did mostly "construction" or "demolition" work, and that its Stonhard

work was not its primary business. Tr. 233:24-234:24. However, it is clear from the evidence presented at trial that HPF did the same Stonhard work as High Performance a large percentage of the time, even if not exclusively. Sofield testified that HPF prepared concrete floors, installed resinous flooring, and used products made by Stonhard—just as High Performance did. Tr. 236:22-237:8. HPF reported on its income tax return that its primary business was construction and that its principal product was resinous floors. Tr. 236:14-18. Defendants did not call a single HPF employee to testify that the company's work primarily involved other types of work; presumably, if that were so, employees who performed these other types of work would have been readily available as trial witnesses. In contrast, Cesar Albuquerque, a former HPF employee, testified that the jobs he did for High Performance and HPF involved the same type of work and that he never performed demolition work while working for HPF. Tr. 111:6-25.

Based upon the evidence described above, I find that HPF and High Performance shared a common business purpose. Any demolition or construction work HPF may have performed was irregular and insufficient to support a contrary finding. *See D&N Insulation Co.*, 2015 WL 5121458, at *3, *7.

### III.     Management, Supervision, and Ownership

Two companies may be found to be alter egos for purposes of ERISA or a single employer under the LMRA when the same individuals are involved in the ownership, management, and supervision of the entities. *See Castaldi*, 2015 WL 3929691, at *3; *Mauro's Plumbing*, 84 F. Supp. 2d at 349-350. Alter ego or single employer status may also be found where distinct entities share employees. *See N.Y. Dist. Council of Carpenters Pension Fund v. Perimeter Interiors, Inc.*, 657 F. Supp. 2d 410, 421 (S.D.N.Y. 2009); *Mauro's Plumbing*, 84 F. Supp. 2d at 349-350.

According to Sofield, HPF was located at 2 Main Street, Ridgefield Park, New Jersey 07660. Tr. 245:2-3; Defs.' Trial Ex. HPF 2, Certificate of Dissolution of HPF, Inc., at 1. Balzano testified that High Performance was located at 40 Park Place in Lodi, New Jersey. Tr. 365:20-22. Albuquerque, the former employee called by plaintiffs, testified that employees of both HPF and High Performance worked out of the same location at 40 Park Place. Tr. 103:2-12. Defendants did not call any employees to testify that they worked for HPF out of the Main Street location.

The ownership of 2 Main Street is further evidence of the interlocking relationship between High Performance and HPF, and between Balzano and Sofield. The building is owned by 2 Main Street LLC, which is in turn owned in equal thirds by Sofield, Balzano, and Jeffrey Castaldo, Balzano's brother-in-law. Tr. 230:5-24; 336:7-15. Although every other commercial tenant at the 2 Main Street building, including another company owned by Sofield called Sofield Manufacturing, paid rent to the LLC, HPF did not. Tr. 245:2-11; 393:15-25. This undisputed fact is some corroboration of Albuquerque's testimony that HPF did not actually operate there.

Payrolls from the defendant companies demonstrate that the same individuals worked for both HPF and High Performance simultaneously, including long-time High Performance supervisors and foremen. A payroll audit of High Performance and HPF conducted on plaintiffs' behalf for the periods of January 1, 2012 through December 31, 2014 and July 1, 2012 through June 30, 2015, respectively, revealed that some employees worked for both companies at the same time.[5] Pls.' Trial Ex. A, High Performance Floors Audit Report; Pls.' Trial Ex. B, HPF Audit Report. For example, individuals such as Albuquerque, Claueis Alves, Vinnicius Andrade, and Frederico Cabral, as well as several others, worked for both High Performance and

---

[5] The reports were entered into evidence at trial for the limited purpose of identifying defendants' employees and not to prove the amount of any contributions owed. Tr. 50:17-22.

HPF during the same general time frame during 2012 and 2013. Tr. 57:6-15; Pls.' Trial Ex. A, at 0029; Pls.' Trial Ex. B, at 0057. The auditor called as a witness by plaintiffs estimated that HPF and High Performance shared approximately twelve employees during 2013. Tr. 57:16-18.

Some employees worked for both High Performance and HPF during a single week. For example, hours are recorded for Albuquerque, Adan Gomez, Diego DaSilva, and Jorge Zamora in the payroll records of both High Performance and HPF for the pay period of August 31, 2012 to September 6, 2012. Pls.' Trial Ex. C, Payroll, at 00098-00101 (showing employees of High Performance Floors); Pls.' Trial Ex. D, Payroll, at 01009-01012 (showing employees of HPF). As another example, Zamora worked 39 hours for High Performance and 10.5 hours for HPF during the week of March 27, 2015. Pls.' Trial Ex. U, HPF, Inc. Payroll Summary, at 00980; Pls.' Trial Ex. Q, High Performance Floors Payroll Summary, at 00160. During that same week, Amancio Souza worked 39 hours for High Performance and 40 hours for HPF. Pls.' Trial Ex. U, at 00980; Pls.' Trial Ex. Q, at 00160. Claueis Alves worked 43.5 hours for High Performance and 53.5 hours for HPF during the pay period from April 10 through April 16, 2015, and Elton Neto worked 40.5 hours for High Performance and 17.5 hours for HPF that same week. Pls.' Trial Ex. U, at 00965; Pls.' Trial Ex. Q, at 00182. Interestingly, during that very same week, Frederico Carvalho Martins, Josafa Souza, Alves, and Amancio Souza each worked a total of precisely 97 hours at High Performance and HPF, or just HPF. Pls.' Trial Ex. U, at 00965; Pls.' Trial Ex. Q, at 00182; Tr. 423:14-424:13. This week fell during the month that, according to Balzano, HPF subcontracted work to High Performance for the "Route 17 Bergen Mall" job. Tr. 422:1-3; 415:13-416:21. The similarity in hours worked suggests that all of the employees were working on the same project and reporting their hours to and getting paid by both High

Performance and HPF at the same time, thus indicating centralized control over a common workforce.[6]

Defendants attempt to explain away the significance of these shared employees by suggesting that workers involved in flooring installation and construction work do not generally work consistently for one company but instead move from employer to employer to obtain steady work. Defs.' Mem. at 13. This explanation might be somewhat persuasive if the workers employed by High Performance and HPF also worked for other construction companies at the same time. The evidence, however, is to the contrary.

Albuquerque testified that, while employed by High Performance, Metro Floors, and HPF, he worked only for these entities and did not perform work for any other flooring companies. Tr. 104:22-105:1; 150:4-15. Albuquerque also said that there was no such thing as "leaving or coming back" to High Performance or HPF. Tr. 176:23-24. Albuquerque further stated that, while working for both High Performance and HPF, to him they were "all the same business," except that he was paid through High Performance for work on union jobs and through HPF when the job did not require union labor. Tr. 111:3-10; 176:15-177:9. Adan Gomez, another former High Performance employee, also testified at trial. Gomez stated that during the 20 years he worked for Metro Floors, High Performance, and HPF, he never received a flooring job from a company run by anyone other than Balzano. Tr. 196:5-7. A third former High Performance employee, Florivaldo Groberio, was called by defendants. Groberio acknowledged that during the 13 years he worked for High Performance, the only other company

---

[6] Because the payroll records reflect hours worked on a weekly basis, they do not conclusively prove that an employee worked for HPF and High Performance on the same day. Given the number of hours worked, though, it seems highly likely that at least some did. Even arranging for employees to work long hours for two companies during the same week undoubtedly required close coordination among supervisors assigning hours.

to give him work was Metro Floors.  Tr. 483:11-17; 492:2-15.  Defendants did not call anyone who testified to employment by Metro Floors, High Performance, HPF, *and* any other companies during the same period of time.  Accordingly, I reject defendants' suggestion that the overlap in employees is insignificant because workers seek employment from large numbers of installers simultaneously, and instead conclude that the substantial overlap in employees strongly supports a finding of alter ego or single employer status.

Sofield's lack of involvement, or even familiarity, with the employees of HPF is further evidence that management and control were centralized in Balzano's hands.  Albuquerque and Gomez, who worked for Metro Floors, High Performance Floors, and HPF, testified that they never saw Sofield at a job site, and did not even know anyone by that name.  Tr. 125:17-126:1; 203:23-204:7.  Albuquerque further testified that, while working for HPF, he reported to Balzano.  Tr. 102:23-103:1.  While he never heard of Sofield, Albuquerque saw Balzano on many job sites, including those for HPF jobs.  Tr. 117:12-16; 160:8-18.  According to Albuquerque, he received his paychecks at the same location and in the same manner whether he was being paid by High Performance or HPF.  Tr. 120:5-19.  Gomez similarly testified that he was paid in the same manner regardless of whether he worked for HPF or High Performance, and indicated that he understood HPF to be Balzano's company and believed it was located at the same premises as High Performance.  Tr. 195:4-196:17.  Albuquerque further testified that one person – Jacqueline Robertson – handled employment and tax information and other similar personnel matters for High Performance, HPF, and Metro Floors.  Tr. 103:19-104:16.  Balzano acknowledged during his testimony at trial that Robertson works as his office employee at High Performance and that he has known her for 19 years.  Tr. 397:21-398:4.

Strikingly, Sofield testified similarly to Albuquerque and Gomez. Although he claimed to own HPF, Sofield was not familiar with the company's payroll records when they were shown to him during the trial. Tr. 281:4-7. Sofield also acknowledged in his testimony that he never met many of the employees listed on HPF's payrolls, did not hand out checks himself, thought the checks were sometimes mailed and sometimes picked up, and testified that the only reason he knew employees were paid by HPF was because they were on the payroll list shown to him during the trial. Tr. 283:8-284:6. Finally, defendants did not call a single employee who testified to working for HPF under Sofield's supervision, or being hired, fired, or otherwise interacting with Sofield as an employee of HPF. Nor did defendants present testimony from a single owner, contractor, or other HPF customer who had ever worked with or even heard of Sofield. Even the Stonhard vendor representative called to testify by defendants stated that, while he was familiar with Balzano, he did not know Sofield. Tr. 508:15-18.

Based upon the evidence described above, I find that High Performance and HPF were operated and managed by Balzano, and that Balzano supervised the employees of both companies. I further find that High Performance and HPF shared a substantial number of employees, and that those employees performed the same type of work for both companies. This evidence strongly supports a finding of alter ego and single employer status.

## IV. Operations

Shared assets or finances and shared offices and telephone numbers are standard indications that companies have common operations. *See, e.g.*, *D&N Insulation Co.*, 2015 WL 5121458, at *8; *Castaldi*, 2015 WL 3929691, at *1; *Mauro's Plumbing*, 84 F. Supp. 2d at 347, 350. Bank records will frequently be relevant, particularly when the entities have made

payments to each other and on each other's behalf.  *See Mauro's Plumbing*, 84 F. Supp. 2d at 348.

The evidence demonstrates that High Performance and HPF both operated out of the same location at 40 Park Place.  As discussed above, the two employees who testified in plaintiffs' case stated that they worked out of the same location at 40 Park Place whether performing jobs for High Performance or HPF.  Also as discussed above, although Sofield claimed that HPF was located at 2 Main Street, it – unlike every other tenant on the premises – paid no rent to operate there.  Albuquerque testified that he had never even been to the 2 Main Street location.  Tr. 125:11-13.

In addition, High Performance and HPF's payroll practices were closely linked.  Employees received their paychecks, whether from High Performance or HPF, on the same payday, typically in the same location.  Furthermore, employees reported their hours worked for either company to Robertson every Monday on the same timesheets.  Tr. 123:3-11; 125:6-7.

The evidence also suggests that Balzano had at least some control over HPF's bank account.  Although Sofield testified that Balzano did not have access to HPF's bank account or checkbook, he also acknowledged that Balzano signed at least two checks from that account.  Tr. 256:3-22.  One was a paycheck for $1,041.29 from HPF made payable to Caique Silva and signed by Balzano.  Pls.' Trial Ex. J, HPF, Inc. Checks, at 00085.  Another was a check made payable to Total Wines for $673.65, said by Sofield to be for liquor that he asked Balzano to pick up for him at a time when Balzano just happened to have an unsigned HPF check in his possession.  Pls.' Trial Ex. J, at 00390; Tr. 343:22-344:6.  Sofield did not explain how Balzano came to have a blank HPF check with him, but suggested it was possible Robertson, the office

employee at High Performance, had access to the HPF checkbook because she "helped [him] sometimes." Tr. 256:23-257:1.

The evidence indicates that, at least on occasion, checks from customers made out to High Performance or HPF were deposited into the other's account. For example, checks from Ironbo Inc. on July 2, 2012 for $1,800, from Hackensack University Medical Center on July 3, 2012 for $1,845, and from Chelsea Doggie Day Care on July 11, 2012 for $600 were all made out to High Performance Floors, but were deposited into HPF's bank account. Pls.' Trial Ex. I, HPF, Inc. Deposits, at 00785-00787; Tr. 264:12-267:13. These checks made out to High Performance were the first and only deposits made into HPF's bank account during the month in which it opened. Tr. 267:15-25. Furthermore, the address that was included on two of these checks was 40 Park Place, where High Performance is located. Pls.' Trial Ex. I at 00785, 00786; Tr. 268:14-22.

Likewise, checks from Maadava Sugar Maple LLC on October 5, 2012 for $6,350 and from Stonhard on June 3, 2013 for $12,852.50, one indicating HPF's address as 40 Park Place and the other indicating HPF's address as 2 Main Street, were both made out to HPF but deposited into High Performance's bank account. Pls.' Trial Ex. N, High Performance Floors Deposits, at 000856, 000876. Also, four checks from Shawmut Woodworking and Supply, two that were made out to HPF at 2 Main Street on May 19 and May 30, 2015 for $44,539.87 and $41,150.25, respectively, one that was made out to High Performance at 40 Park Place on September 8, 2015 for $4,500, and a fourth check made out to HPF, again at the 2 Main Street address, on December 1, 2015 for $10,755 and this time endorsed "HPF," were all deposited into High Performance's bank account. Pls.' Trial Ex. N, at 001033, 001051, 0001063, 001095-001096.

Balzano testified that he would have deposited checks made out to HPF into a High Performance account only after checking his records to make certain that the payment was related to a High Performance invoice. Tr. 433:25-434:12. While that may be so, the payments described above demonstrate common control over payments made to HPF and High Performance, and suggest that customers either confused the two companies or believed they should send checks to Balzano whether they were invoiced by High Performance or HPF. Indeed, as discussed above, had the confusion reflected by these payments come as a surprise to Balzano, it seems likely he would have asked his long-time friend Sofield to change the newer company's similar name. However, there is no evidence any such request was made or that the topic was even discussed.

Payments were also made from HPF to High Performance floors for "outside services" on two occasions, once for $19,000 on March 30, 2015, and once for $10,000 on April 27, 2015. Pls.' Trial Ex. K, HPF, Inc. General Ledger, at 01888; Tr. 279:15-280:15. Sofield testified that these payments were probably for union jobs where High Performance served as a subcontractor for HPF because HPF did not do any union work. Tr. 288:9-17. Balzano similarly testified that these payments were made in connection with a subcontract High Performance entered into with HPF on the "Route 17 Bergen Mall" job. Tr. 421:8-422:20. Assuming there was a subcontract, the circumstances under which it was made underscore the close relationship of the two companies. Balzano, an experienced businessman, testified that there was no written contract between High Performance and HPF for subcontracted work, and that he simply trusted that HPF would pay High Performance whatever it was owed. Tr. 478:3-12. Sofield testified that he could not remember what obligations, if any, HPF had in connection with any subcontract with High Performance. Tr. 289:1-9. Even apart from this lack of formality and detail in the dealings

between HPF and High Performance, the fact that one company took over a contract originally awarded to the other is itself an indication of alter ego status. *See Castaldi*, 2015 WL 3929691, at *3.

Based upon the evidence described above, I find that High Performance and HPF operated out of the same location and that their finances were at least to some degree intermingled. This evidence supports a finding of alter ego and single employer status.

### V.    Equipment

Companies may also be found to be alter egos when they share equipment, tools, supplies, or other resources in connection with their operations. *See, e.g.*, *D&N Insulation Co.*, 2015 WL 5121458, at *3, *9 (finding alter ego status because, among other things, both companies used the same vehicles in connection with their operations); *Castaldi*, 2015 WL 3929691, at *4-5 (finding alter ego status where entities used same suppliers and leased equipment from the same source); *Jacobson*, 2007 WL 1774911, at *4, *6 (finding alter ego status based, among other things, on use of same vehicles used to make deliveries); *Bourgal*, 969 F. Supp. at 857, 863 (finding alter ego status because, among other things, entities used the same trucks bearing different names depending on the job being performed).

The evidence at trial demonstrated that High Performance and HPF employees shared equipment, tools, supplies, and resources. Albuquerque testified that for any project, whether performed under the name Metro Floors, High Performance, or HPF, the employees would use the same machines and equipment taken from the same warehouse. Tr. 110:3-20. Albuquerque also said that at least some of the vans workers used said "HPF," most of them said "Concrete Surface Prep," and others said "High Performance Floors" and "Stonhard"; furthermore, the vans and trucks were used interchangeably, without regard to whether High Performance or HPF was

performing the job. Tr. 126:5-23; 146:19-21; 147:6-8. Gomez testified that the van he used for jobs was given to him for that purpose by Balzano. Tr. 194:2-15. Employees also received separate shirts for the separate companies – some that said "HPF" and some that said "High Performance" or "Stonhard" – but it did not matter which jobs they wore these shirts to. Tr. 128:18-19. Furthermore, employees received these shirts only from Balzano, and they also received personal protection equipment only from him. Tr. 128:18-129:6. Defendants did not call any employee to testify that High Performance and HPF each had its own vans, tools, or other equipment, nor did they call any HPF employee who described obtaining vehicles, equipment or clothing from Sofield.

Further evidence that Sofield was not involved in managing HPF was developed in this context as well. Sofield acknowledged in his testimony that he did not know whether the HPF workers had vans themselves, that he assumed workers used their own cars to travel and carry tools and equipment to jobs, and that he did not know much about some of the large equipment required to install resinous floors. Tr. 300:6-301:17. Sofield further stated that, although HPF at one time employed more than 20 workers, it did not own or provide any vehicles for them to get to and from job locations with heavy equipment. Tr. 299:22-300:5. Albuquerque testified, however, that the flooring jobs frequently required workers to use a scarifier, which weighs about 300 pounds, or a shot blaster, which weighs approximately 1,000 pounds. Tr. 108:2-109:5. It is difficult to imagine that Sofield could have managed a floor installation company without knowing about the equipment required to do the work or having any idea how his employees transported such heavy equipment to and from job sites.

Sofield's testimony about how HPF acquired equipment to perform jobs was similarly lacking in credibility. Apparently in an effort to rebut the evidence presented earlier by plaintiffs

that HPF shared equipment with High Performance, Sofield claimed that he leased equipment for HPF and met other expenses with his own funds, paying either in cash or by credit card, but did not keep track of those expenses so they could be deducted from HPF's income for tax purposes or otherwise recorded. Tr. 292:19-293:8. Yet defendants provided no receipts, or even a single credit card statement, to corroborate this claim, despite knowing it was sharply disputed. Sofield also testified that he never took a salary and did not gain anything financially from HPF during the three years it was operating. Tr. 253:14-19. It is difficult to imagine that Sofield took no salary, yet incurred substantial expenses without seeking reimbursement.

Based on the evidence described above, I find that employees acquired vans, tools, and equipment from Balzano at High Performance's warehouse and used it without regard to whether the job was being performed by High Performance or HPF. This evidence further supports a finding of alter ego and single employer status.

## VI.    Customers

Sharing of clients and customers is also indicative of an alter ego relationship. *Castaldi*, 2015 WL 3929691, at *4 (finding alter ego status based in part on common vendors and at least one long-time customer in common); *Jacobson*, 2007 WL 1774911, at *6 (finding alter ego status based, in part, on the two companies servicing substantially the same customers); *Mauro's Plumbing*, 84 F. Supp. 2d at 348 (finding alter ego status based in part on companies sharing 20% of the same customers); *Bourgal*, 969 F. Supp. at 863 (finding alter ego status based in part on sharing of "at least some of the same customers").

There is little evidence indicating that High Performance and HPF regularly shared customers, although, as discussed above, it seems they worked on the same job at least on occasion. The evidence is undisputed, though, that both worked for the same vendor, Stonhard.

High Performance worked almost exclusively for Stonhard, and installed other types of floors only in the rare circumstance that Stonhard could not do the job. Tr. 387:2-9. HPF did Stonhard installations as well. The evidence suggests that HPF's Stonhard installation work was the result of Balzano's relationship with Stonhard and was performed under Balzano's supervision with the same equipment and employees used by High Performance. Sofield testified that HPF had an installer agreement with Stonhard. Tr. 299:5-7. As noted above, though, the Stonhard vendor representative called to testify by defendants stated that, while he was familiar with Balzano, he did not know Sofield. Tr. 508:15-18. Sofield also acknowledged that he had no experience installing Stonhard's products, he was never trained in how to install Stonhard's products, and he did not even know exactly what kind of work installing Stonhard products involved. Tr. 298:1-20. The evidence at trial demonstrated that HPF was able to perform Stonhard installation work only because it hired High Performance employees who had experience with it. Tr. 298:21-299:4; 341:5-10. This evidence, too, supports a finding of alter ego and single employer status.

## VII. Intent to Evade Union Obligations

Anti-union animus is relevant to determining alter ego status and may even provide a sufficient basis for concluding that two entities are alter egos; nevertheless, a showing of anti-union animus is not required. *D&N Insulation Co.*, 2015 WL 5121458, at *6; *Goodman Piping Prods., Inc. v. N.L.R.B.*, 741 F.2d 10, 12 (2d Cir. 1984). Thus, even when a second company is formed with innocent intentions, overlapping management, supervision, and ownership may support a finding that two entities are alter egos. *Bricklayers and Allied Craftworkers Local 2 v. C.G. Yantuch, Inc.*, 316 F. Supp. 2d 130, 144 n.10 (N.D.N.Y. 2003).

Here, though, there is compelling evidence of anti-union animus. Balzano would have had little reason to arrange for his friend Sofield to form HPF unless he sought a vehicle through

which he could perform Stonhard jobs that did not require union labor without satisfying the requirements of the CBA. Accordingly, and based upon the evidence discussed above, I find that High Performance and HPF worked together to evade High Performance's obligation to remit contributions to the plaintiff Funds.

## VIII. Remaining Single Employer Factors

The cases setting forth the standard for determining whether two entities are a single employer identify two factors not explicitly enumerated in the alter ego case law: centralized control of labor relations and family connections between or among the various enterprises. Although these factors are not discussed above in these specific terms, the evidence already set forth supports a finding in plaintiffs' favor with respect to them.

Although no factor determines single employer status, centralized control of labor relations "is the central concern." *Daikin Am. Inc.*, 756 F.3d at 227 (citing *Murray*, 74 F.3d at 404). As discussed above, the evidence demonstrated that High Performance and HPF had at least some employees in common, and that these employees did not work for any other company while employed by High Performance and HPF. The employees worked out of the same location, used the same vans and equipment, reported their hours on the same timesheets, and knew only Balzano as the owner and manager of both companies. Albuquerque testified that Balzano was his boss at High Performance and at HPF. Tr. 102:23-24. Gomez similarly testified that he received instructions about HPF jobs from Balzano. Tr. 196:14-17. Other than some self-serving testimony of Sofield that I do not credit, defendants presented no evidence that Sofield ever supervised HPF employees, provided them with equipment or instruction, arranged to pay them, or even knew who they were.

Although Balzano and Sofield are not related, they have known each other since childhood and have shared a friendship lasting more than 30 years. They owned a building together through their company, 2 Main Street LLC, demonstrating that they had a close business relationship as well. In short, it is clear from the evidence at trial that the entities did not function at arm's length, and that they constituted a single employer.

## IX.    Single Bargaining Unit

As discussed above, employees comprise a single bargaining unit when they perform the same work, under the same conditions, in the same geographic area. Here, as the evidence discussed above demonstrates, the employees of HPF and High Performance overlapped, and the nature of their work was similar, if not identical. I accordingly find that the employees of HPF and High Performance comprise a single bargaining unit.

## CONCLUSION

The evidence recounted above demonstrates that High Performance and HPF shared management, employees, operations, and equipment, and that they had a common business purpose. The control of labor relations of both High Performance and HPF was centralized, the owner of High Performance had a close personal connection to the owner of HPF, and their employees constituted a single bargaining unit.

For all these reasons, I conclude as a matter of law that plaintiffs have established that High Performance and HPF were, at all times relevant to this case, alter egos, and that they constituted a single employer. Even if clear and convincing evidence were required, I would

reach the same conclusion. Defendants are therefore jointly and severally liable for contributions

due and owing for covered work performed by HPF.

**SO ORDERED.**

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**

Brooklyn, New York
February 9, 2017

*U:\#AMP 2016-2017\Trustees of the Mosaic and Terrazzo ... v. High Performance\Findings of Fact and Conclusions of Law*

*Final.docx*