UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
TRUSTEES OF THE MOSAIC AND　　　　　　:
TERRAZZO WELFARE, PENSION,　　　　　　:　　　　　　MEMORANDUM &
ANNUITY AND VACATION FUNDS, and　　　:　　　　　　ORDER
TRUSTEES OF THE BRICKLAYERS &　　　　:　　　　　　15-CV-2253 (SMG)
TROWEL TRADES INTERNATIONAL　　　　　:
PENSION FUND,　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Plaintiffs,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　- against -　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
HIGH PERFORMANCE FLOORS, INC., a　　:
New York Corporation, HIGH　　　　　　 :
PERFORMANCE FLOORS, INC., a New　　　:
Jersey Corporation, HPF, INC., 2 MAIN　 :
STREET, L.L.C, and 40 PARK PLACE LLC, :
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Defendants.　　　　　 :
-----------------------------------------------------------X
GOLD, STEVEN M., U.S.M.J.:

## INTRODUCTION

Plaintiffs, Trustees of the Mosaic and Terrazzo Welfare, Pension, Annuity and Vacation

Funds and Trustees of the Bricklayers & Trowel Trades International Pension Fund (the

"Funds"), bring this action pursuant to Section 502(a)(3) of the Employee Retirement Income

Security Act of 1974 ("ERISA"), as amended 29 U.S.C. § 1132(a)(3), and Section 301 of the

Labor Management Relations Act of 1947 ("LMRA"), as amended 29 U.S.C. § 185.  Plaintiffs

seek to collect fund contributions which they contend are owed for covered work performed by

employees of defendant HPF, Inc. ("HPF").  Defendants High Performance Floors, Inc., a New

Jersey corporation, and High Performance Floors, Inc., a New York corporation (collectively

"High Performance"), are signatories to a collective bargaining agreement with Local 7 of the

New York, New Jersey and Vicinity International Union of Bricklayers and Allied Craftworkers (the "CBA") that requires contributions to the Funds.

After a three day non-jury trial on liability, the Court concluded that High Performance and HPF were alter egos and that they constituted a single employer. See Memorandum and Order dated February 9, 2017 ("Phase I Decision"), Docket Entry 54, at 27. As a consequence, the Court held defendants jointly and severally liable for contributions to the Funds for covered work performed by HPF. *Id*. at 28.

On July 31, 2017, defendants moved for reconsideration of the Court's decision on liability. Defs.' Brief in Support of Motion for Reconsideration of Phase I Decision ("Motion for Reconsideration"), Docket Entry 71-1. For the reasons stated in a separate Memorandum and Order issued today, that motion is denied.

A bench trial on damages was held on July 5, 2017. *See* Transcript of July 5, 2017 ("Dmg. Tr."), Docket Entry 69. After the trial, both plaintiffs and defendants submitted additional briefing. Plaintiffs submitted alternative calculations of damages, responding to issues raised at trial. Plaintiffs' Letter dated July 19, 2017, Docket Entry 66; Declaration of Michael Sarosy ("Sarosy Decl."), Docket Entry 67. Defendants submitted a post-trial brief in which they too proposed an alternative means of determining damages. Phase II Brief on Behalf of Defendants ("Defs.' Phase II Brief"), Docket Entry 70. The Court's findings of fact and conclusions of law with respect to damages pursuant to Federal Rule of Civil Procedure 52 are set forth in narrative form below. *See* 9 *Moore's Federal Practice* § 52.13[1].

For the reasons described herein, I conclude that the hours of covered work performed by HPF employees are best approximated by discounting the total hours worked by the percentage of HPF's gross revenues attributable to Pennsylvania Stonhard work. I therefore award damages

2

based upon the audit submitted by plaintiffs that assumes that 69% of the total hours worked by HPF employees was covered work. *See* Sarosy Decl. ¶ 10 and Ex. B ("69% Audit"), Docket Entries 67 and 67-2. I further award plaintiffs attorneys' fees and costs.

## FACTS

The underlying facts are set forth in detail in the Court's Phase I Decision and accordingly are reviewed only briefly here. Plaintiffs are trustees of the Mosaic and Terrazzo Welfare, Pension, Annuity and Vacation Funds and the Bricklayers and Trowel Trades International Pension Fund. Compl. ¶¶ 4-5, Docket Entry 1. Guy Balzano, the principal of High Performance, founded the floor installation company in December 1991. Phase I Tr. 361:5-9.[1] High Performance's primary contract is with Stonhard, Inc. ("Stonhard"), a resinous floor vendor that engages companies like High Performance to install its products. Phase I Tr. 361:10-362:13. High Performance is a signatory to the CBA, which requires contributions to the Funds for covered work.

The principal of defendant HPF, at least in name, is Harold Sofield, who founded the company in May of 2012. Phase I Tr. 233:8-16. HPF is not a signatory to the CBA. After the trail on liability, in light of all the evidence presented, the Court concluded as a matter of law that High Performance and HPF were alter egos and that they constituted a single employer. Phase I Decision at 27. Further, the Court found that employees of High Performance and HPF were a single bargaining unit. *Id.* Consequently, the Phase I Decision established that defendants are jointly and severally liable for contributions to the Funds as required by the CBA for covered work performed by HPF. *Id.* at 28.

---

[1] "Phase I Tr." refers to the transcript of the bench trial on liability held on October 5, 6, and 18, 2016, Docket Entries 51-53.

Plaintiffs called two witnesses at the damages phase of the trial. Patrick Bonici, a business agent for Local 7, the union local associated with the Funds, described the benefit fund contribution requirements of the CBA. Dmg. Tr. 12-26. Michael Sarosy, an employee of an independent CPA firm, testified about payroll audits his firm performed of High Performance Floors and HPF. Sarosy testified that his firm's audit of High Performance Floors revealed a deficiency of $12,308.31 in contributions due and owing, as well as $3,961.96 in interest, $2,170.50 in liquidated damages, and audit costs of $3.160, for a total amount due of $21,600.77. Dmg. Tr. 62. Sarosy then described his firm's payroll audit of HPF. Sarosy testified that his firm reviewed HPF's payroll records, cash disbursements, and tax returns and related documents. Dmg. Tr. 65. The auditors calculated that HPF owed $1,176,912.83 in contributions, as well as interest in the amount of $302,144.44, liquidated damages totaling $209,091.64, and audit costs of $5,640, for a total amount due of $1,693,788.91. Dmg. Tr. 68-69.

The amounts attributed to HPF in this original calculation by plaintiffs' auditors assumes that all of the work performed by HPF employees was covered work, or labor for which the CBA requires contributions to the funds. However, the CBA applies only to certain types of work, such as cutting and shaping marble, glass, enamel and ceramics; mosaic and terrazzo work; and installations of epoxy resinous flooring. CBA, Pl's. Ex. V, art. IV. The territorial scope of the CBA is limited as well; only work performed in New Jersey and parts of New York State is covered. CBA art. III.

Defendants contend that much of the work performed by HPF was not covered by the CBA, either because it involved demolition and general construction work and not the sort of tile and epoxy flooring work described in the CBA, or because it was done in Pennsylvania, beyond the geographic scope of the CBA. The evidence presented at trial did in fact establish that some

HPF work occurred in Pennsylvania. Two aspects of the trial record are particularly salient in this regard. First, Cesar Albuquerque, a former employee of High Performance and HPF, testified that about 80 percent of his work for High Performance and HPF was performed within the CBA's geographical scope, but also indicated that this figure was approximate and that he had difficulty remembering specific jobs. Phase I Tr. 114:23-115:9. Second, the vast majority of HPF's Stonhard Work Orders, which were received in evidence at trial, were for work to be performed in Pennsylvania. Def's Exs. 12-15 (collectively, "Stonhard Work Orders"). Some of the Stonhard Work Orders are marked both "submitted" and "accepted," but others are marked only "submitted."

## DISCUSSION

The primary issue to be determined is the amount of contributions owed for labor performed by employees of HPF. The Court must also determine the amount of any contributions due and owing as a result of labor performed by employees of High Performance. Finally, the Court must calculate interest, liquidated damages, audit fees, attorneys' fees, and costs.

### I. Contributions, Liquidated Damages, Interest, and Audit Fees

#### A. *Contributions Due from HPF*

As noted above, plaintiffs' auditors originally calculated the amount of contributions due from HPF after reviewing HPF's payroll records, tax documents, and cash disbursements journal, and by assuming that all of the work performed by HPF employees was covered work. Plaintiffs acknowledge, though, that Cesar Albuquerque, a former employee of High Performance and HPF, testified that, while all of the work he performed for defendants was

5

within the trade jurisdiction of the CBA, only about 80 percent of his work for defendants was performed within the CBA's geographical limits. Plaintiffs' Letter dated July 19, 2017.

After the damages trial was completed, plaintiffs submitted three revised audit reports. Sorosy Decl. Exs. A, B, C. The first revised audit report is similar to the one introduced at the damages trial as Plaintiffs' Exhibit W. The report received at trial as Exhibit W combines the amounts claimed by plaintiffs as due and owing based upon the deficiency found with respect to High Performance and the labor performed by employees of HPF, but includes only 80% of the hours of labor performed by any employee who worked exclusively for HPF or who worked some hours for HPF and some hours for High Performance. Dmg. Tr. 72. The first revised audit report submitted by plaintiffs after the damages trial differs from Exhibit W only in that it excludes certain charges that plaintiffs no longer press, such as contributions they originally sought for union dues, a political action committee, and defense and building funds. Plaintiffs' Letter dated July 19, 2017; Sorosy Decl. ¶¶ 7-8, Ex. A (the "80% Audit"). Plaintiffs contend that the most reliable evidence of the percentage of HPF's work that is covered by the CBA is Albuquerque's testimony that 80% of the work he performed for High Performance and HPF was covered work within the trade and territorial jurisdiction of Local 7. Plaintiffs accordingly urge the Court to award damages based upon the 80% Audit. Plaintiffs' Letter dated July 19, 2017.

Defendants contend that, with the exception of a small number of Stonhard jobs performed in New York and New Jersey, the remaining work performed by HPF was not covered work. Defendants support this contention by citing excerpts of the testimony given by Harold Sofield during the liability phase of the trial. Def's' Phase II Brief at 6-7. For example, defendants point to Sofield's testimony at trial that HPF didn't do much flooring work, and that

6

most of its work involved demolition and Sheetrock installation. Phase I Tr. 310:9-12. Yet Sofield also acknowledged testifying at his deposition that HPF "did primarily grinding floors, cleaning floors, and installing Epoxy floors," and that some of the floor installation work HPF performed did not involve Stonhard. Phase I Tr. 310:20-23; 311:1-5. Defendants also rely upon Sofield's testimony that HPF had employees working in the Philadelphia area whose work involved knocking down and installing Sheetrock and doing other odd jobs; in the cited testimony, however, Sofield was apparently describing the type of work HPF was doing when the company was first formed. Phase I Tr. 318:22-319:6. In the remaining testimony cited by defendants, Sofield also seems to be describing only the first few months of HPF's operations. Phase I Tr. 327:20-328:11.

For the reasons explained above, Sofield's testimony provides little if any meaningful information about the percentage of HPF's work that was within the subject matter or territorial jurisdiction of Local 7. Even if Sofield had testified more clearly and precisely about the nature of the work performed by HPF over time, I would not rely upon it because, for reasons explained throughout the Court's Phase I Decision, I found much of Sofield's trial testimony to be unworthy of belief.

Moreover, documentary evidence received at trial corroborates Albuquerque's testimony that the work performed by HPF primarily involved installation of resinous floors, which is work covered by the CBA. HPF's federal tax returns for 2012 through 2015 were received in evidence at trial. Each return includes a Schedule K on which the business activity of HPF is described as "construction" and the product or service provided by HPF is stated to be "resinous floors." HPF Exs. 8-11; Phase I Tr. 330:13-332:12.

It is also striking that defendants offered no evidence to corroborate Sofield's assertion that most of HPF's work was not covered by the CBA. If in fact much of HPF's work was performed in Pennsylvania or involved demolition and construction work, defendants could have presented evidence demonstrating that at trial. Yet defendants did not introduce a single contract entered into by HPF or any invoice it issued for demolition or general construction work. Defendants offered no invoices it paid or checks it issued to purchase Sheetrock or other general construction materials. Finally, defendants did not call a single HPF employee or client to testify that HPF ever removed or installed drywall or performed other general construction or demolition work.

Generally, a plaintiff bears the burden of proving its damages. However, when plaintiff trustees seeking to recover unpaid contributions provide sufficient evidence to show the amount and extent of covered work as a matter of just and reasonable inference, and provide evidence also showing that employees performed work for which contributions were not paid, and where the defendants have failed to keep proper records, the burden of proof shifts to the defendants to disprove damages. *Reilly v. Reem Contracting Corp.*, 380 F. Appx. 16, 20 (2d Cir. 2010) (describing this burden-shifting rule but declining to reach the question of whether it applies in cases brought pursuant to ERISA); *Duffy v. E. Port Excavation & Utilities Contractors, Inc.*, 2013 WL 5309758, at *4 (E.D.N.Y. Sept. 19, 2013) (applying the burden-shifting rule described in *Reilly* to an ERISA suit); *Gesualdi v. RRZ Trucking Co., LLC*, 2011 WL 1988374, at *4 (E.D.N.Y. May 20, 2011) (applying the burden-shifting analysis to an ERISA contributions claim and citing other cases in this District and the Southern District of New York that have done so).

Here, plaintiffs rely upon a payroll audit that was received in evidence, and have adjusted

its calculations to take account of trial testimony indicating that 20% of HPF's work was

performed beyond the territorial limits of the CBA. An auditor's report is commonly accepted to

prove a defendant's delinquency. *See, e.g.*, *Trustees of the Local 7 Tile Indus. Welfare Fund v.

Titan Interiors, LLC*, 2015 WL 4509061, at *2 (E.D.N.Y. July 24, 2015) (collecting cases in

support of the proposition that "[an] auditor's declarations are sufficient to establish the

contributions and related damages owed by [a defendant]"); *Gesualdi*, 2011 WL 1988374, at *4

(quoting *Hanley v. Orient Beach Club, Inc.*, 1998 WL 65990, at *5 (S.D.N.Y. February 18,

1998)) ("Courts have found it appropriate to rely on an audit or an auditor's opinion to prove that

defendant employers did not make required contributions to funds."). Accordingly, the 80%

Audit calculates the amount and extent of covered work as a matter of just and reasonable

inference from the evidence presented at trial. Moreover, it is undisputed that no contributions

were paid in connection with labor performed by employees of HPF. Finally, defendants have

failed to respond with documents or testimony identifying any particular jobs performed by HPF

that did not involve covered work, or even with credible general testimony that HPF performed a

substantial amount of work that was not covered by the CBA. Under these circumstances, I

conclude that plaintiffs have satisfied their burden of proof with respect to damages.

Defendants propose an alternative method of calculating the percentage of HPF's work

that was covered by the CBA. Not surprisingly, defendants' approach results in an amount due

that is far less than the amount determined by plaintiffs' auditors. *See* Defs.' Phase II Brief at

28-29. Defendants' calculations, though, assume that the only covered work done by HPF

employees was on Stonhard jobs performed in New York and New Jersey. I reject this

assumption for the reasons stated above.

9

As noted above, plaintiffs argue that the Court should award damages based upon the 80% Audit, which discounts the total number of hours worked by HPF employees by 20% based upon the trial testimony of Cesar Albuquerque. However, because Albuquerque acknowledged that his testimony was approximate, and because defendants produced work orders indicating that HPF performed Stonhard work in Pennsylvania, I directed plaintiffs to have their auditors calculate the percentage of HPF's gross revenues reflected in the Stonhard Work Orders with Pennsylvania addresses. Dmg. Tr. 105, 108. Plaintiffs did so, and their auditors determined that the total dollar value of the Pennsylvania Stonhard work orders came to 31% of HPF's gross revenues. Plaintiffs' Letter dated July 19, 2017 at 2; Sarosy Decl. ¶ 9. Plaintiffs' auditors then prepared a second audit report (the "69% Audit"), based on the assumption that 69% of the hours worked by HPF employees constituted covered work. Sarosy Decl. ¶ 10 and Ex. B.

Plaintiffs argue that Court should award contributions based upon the results of the 80% Audit, and not the 69% Audit, principally on two grounds. First, although the 69% Audit assumes that HPF actually performed all the work listed in the Stonhard Work Orders, only some of the work orders are marked "accepted," while others are marked only "submitted." Plaintiffs' Letter dated July 19, 2017 at 2. Second, the dollar amounts of the work orders cannot be readily tied to payments from Stonhard reflected in HPF's bank records. *Id.*

The Court will base its award on the 69% Audit. Albuquerque's testimony that only 20% of HPF's work was performed in Pennsylvania was based on his recollection and was concededly approximate. Moreover, while there may be some ambiguity about whether the Stonhard Work Orders marked "submitted" but not "accepted" were actually performed, plaintiffs could have resolved that ambiguity, but failed to do so. The Stonhard Work Orders were received in evidence at trial as HPF Exhibits 12 through 15. Phase I Tr. 332-34. Later in

the trial, defendants called Richard Neill, a vice president of construction for Stonhard, as a

witness. Phase I Tr. 495-509. Plaintiffs thus had an opportunity to seek clarification about

whether the work orders labeled as submitted but not accepted were actually performed, but did

not take it. In this regard, plaintiffs failed to meet their burden of proving that the Stonhard

Work Orders marked only as submitted were not performed.

### B. Contributions Due from High Performance

As noted above, plaintiffs' auditors also determined that High Performance owes a

relatively small amount of contributions. Defendants contend that High Performance submitted

a response to plaintiffs' audit, but that the auditors failed to consider it. Defs.' Phase II Brief at

5-6. Whatever challenge to the auditors' calculations High Performance submitted could have

been presented at trial, but it was not; defendants did not present any evidence at trial

challenging the amounts claimed by plaintiffs' auditor to be due and owing from High

Performance. Accordingly, I adopt the calculations of the auditors with respect to the amount of

contributions owed by High Performance.

### C. Total Contributions Due and Owing from HPF and High Performance.

Plaintiffs' 69% Audit calculates that HPF and High Performance owe a total of

$690,624.87 in benefit contributions to the Funds. For the reasons stated above, plaintiffs will be

awarded this amount.

### D. Liquidated Damages

Plaintiffs seek liquidated damages. *See* Compl. at 12; Plaintiffs' Phase II Pre-Trial

Memorandum of Law at 2, Docket Entry 57. The CBA provides for liquidated damages equal to

20% of outstanding contributions. CBA art. XVIII(F). Although 20% of $690,624.87 totals

$138,124.97, plaintiffs' 69% Audit calculates liquidated damages due to be $134,686.93, a

smaller amount. The Court will include the smaller amount sought in the 69% Audit in its final judgment.

### E. Interest

Interest on unpaid contributions is calculated "using the rate provided for under the plan." 29 U.S.C. § 1132(g)(2); *Iron Workers Dist. Council of W. N.Y. & Vicinity Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1508 (2d Cir. 1995). The CBA provides for interest at a rate of 10% per annum. CBA art. XVIII(F). Interest at the rate of 10% per annum on the $690,624.87 owed yields approximately $189.21 per day.[2] Because contributions became due at various times during the audit period, pre-judgment interest may be deemed to accrue from a "single reasonable intermediate date" within the audit period. *See* N.Y. C.P.L.R. 5001(b). The audit period for the 69% Audit ran from January 1, 2012 through June 30, 2015. *See* 69% Audit at 1. Therefore, the amount of prejudgment interest on unpaid contributions should be calculated by the Clerk of Court at the rate of $189.21 per day from September 30, 2013, the median date of the audit period, through the date final judgment is entered.

### F. Audit Fees

Plaintiffs are also entitled to reimbursement for the cost of the audit. CBA art. XVIII(F) (holding a defaulting employer liable for "such other costs and penalties as may be assessed by a court as provided under ERISA"); *see, e.g.*, *Martone v. HST Roofing, Inc.*, 2007 WL 595054, at *4 (E.D.N.Y. Feb. 22, 2007) (awarding $4,940.00 in audit fees); *Morin v. Nu-Way Plastering Inc.*, 2005 WL 3470371, at *1 (E.D.N.Y. Dec.19, 2005) (awarding $4,114.31 in audit fees).

---

[2] To arrive at the daily rate of interest, I divided 10% of $690,624.87 by 365.

Plaintiffs' 69% Audit indicates that plaintiffs incurred audit costs $8,800.00. 69% Audit at 2. This amount will accordingly be included in plaintiffs' award.

## II.    Attorneys' Fees and Costs

Finally, plaintiffs seek attorneys' fees and costs. Compl. at 12; Declaration of Nicole Marimon ("Marimon Declaration"), Docket Entry 68. Upon a finding that a defendant has been delinquent in paying contributions, liability for attorneys' fees and costs is mandatory under § 1132(g)(2). *See Annuity, Welfare & Apprenticeship Skill Improvement & Safety Funds of the Int'l Union of Operation Engineers, Local 15, 15A, 15C, 15D, AFL-CIO v. A.G. Construction*, 2014 WL 354647, at *6 (citing *Iron Workers*, 68 F.3d at 1506 (2d Cir. 1995)). The CBA likewise provides for recovery of "reasonable attorney's fees and such other costs and penalties as may be assessed by a court as provided under ERISA." CBA art. XVIII(F).

In this Circuit, courts awarding attorneys' fees calculate a "presumptively reasonable fee" by taking the product of the hours reasonably expended and a reasonable hourly rate that reflects "what a reasonable, paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183-84 (2d Cir. 2008). To determine whether an hourly rate is reasonable for a particular case, courts "should rely on reasonable hourly rates approved by other courts in the District and [their] own familiarity with the prevailing rates in its District." *Trs. of the Local 813 I.B.T. Ins. Trust Fund v. Sprint Recycling, Inc.*, 2010 WL 3613839, at *4 (E.D.N.Y. Aug. 6, 2010), *report and recommendation adopted by*, 2010 WL 3613834 (E.D.N.Y. Sept. 15, 2010).

A party seeking an award of attorneys' fees must submit contemporaneous time records specifying, for each attorney, the date, the hours expended, and the nature of the work performed. *See N.Y. State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d

Cir. 1983); *see also Bond v. Welpak Corp.*, 2017 WL 4325819, at *6 (E.D.N.Y. Sept. 26, 2017) ("[A]n attorney requesting a fee award bears the burden of supporting his or her application by submitting accurate, detailed and contemporaneous time records." (internal quotation marks and citations omitted)). Plaintiffs' counsel has complied with *Carey* by submitting detailed contemporaneous time records that identify the work each individual performed and the amount of time he or she expended. *See* Marimon Decl., Ex's. A-B, Docket Entries 68-1, 68-2.

Defendants do not argue in their Phase II brief that the number of hours for which plaintiffs' counsel seek reimbursement is unreasonable. Having reviewed the time records in light of my familiarity with the length of the case and the efforts required to litigate it, I conclude that the hours listed in those records are generally reasonable.

Although it generally appears that the hours of attorney time reflected in the records submitted were reasonably expended, those records contain occasional block billing, such that the Court is unable to precisely review each entry. "Where billing records include a large number of block-billed entries, an across-the-board reduction of hours is appropriate." *Bond*, 2017 WL 4325819, at *8; *see also Volpe v. Nassau Cty.*, 2016 WL 6238525, at *10 (E.D.N.Y. Oct. 24, 2016) (collecting cases). Moreover, the records submitted contain numerous entries that group together travel time and court appearances, billed at the same rate.[3] Courts in this Circuit have found it unreasonable for attorneys to charge their full rate for travel time, and have therefore "regularly reduce[d] attorneys' fees by 50 percent for travel time." *Volpe*, 2016 WL 6238525, at *10 (quoting *LV v. New York City Dep't of Educ.*, 700 F. Supp. 2d 510, 526 (S.D.N.Y. 2010)); *see also Green v. City of New York*, 2009 WL 3088419, at *7 (E.D.N.Y. Feb. 13, 2009) (collecting cases), *report and recommendation adopted in relevant part by* 2009 WL

---

[3] For example, several of plaintiffs' billing entries read as follows or similarly: "Prepared for and attended trial, travel to and from court." Marimon Decl. Ex. B at 10-11, 17, 19.

3063059 (E.D.N.Y. Sept. 21, 2009).  Because travel time is plainly only a part of all the work

that is described in these entries however, it would be inappropriate to reduce the whole entry by

50%.  Instead, in light of both the travel times billed as well as the block billing described above,

I apply a 10% across-the-board reduction to the hours for which plaintiffs seek reimbursement as

a practical means of trimming the fee application.  *See Bond*, 2017 WL 4325819, at *8

(collecting cases holding that a Court reviewing a fee application may impose an across-the-

board reduction to hours expended by attorneys).

Plaintiffs seek an award based on rates of $300 per hour for attorneys who have been

practicing since at least 2011 and $225 per hour for less experienced attorneys.  Eastern District

cases awarding attorneys' fees have concluded that the "prevailing rates for experienced

attorneys [in this District] range from approximately $300-400 per hour."  *Konits v. Karahalis*,

409 F. App'x 418, 422 (2d Cir. 2011) (citation omitted); *see also D'Annunzio v. Ayken, Inc.*,

2015 WL 5308094, at *4 (E.D.N.Y. Sept. 10, 2015) ("Courts in the Eastern District of New York

award hourly rates ranging from $200 to $450 per hour for partners" and "$100 to $300 per hour

for associates."); *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 261 (E.D.N.Y. 2014) ("Recent

opinions issued by courts within the Eastern District of New York have found reasonable hourly

rates to be approximately $300-$450 for partners, $200-$325 for senior associates, and $100-

$200 for junior associates.").  Fees that are considered reasonable for attorneys representing

benefit plans are substantially in line with the average rates approved in this district.  *See*

*Ferrara v. Reliable Indus. II, Inc.*, 2012 WL 6851088, at *6 (E.D.N.Y. Sept. 27, 2012) (noting

that attorneys' rates in ERISA cases in the Eastern District "have ranged between $275-$390 for

partners" and collecting cases), *report and recommendation adopted by*, 2013 WL 146085

(E.D.N.Y. Jan. 14, 2013); *see also Gesauldi v. Dan Yant, Inc.*, 6 F. Supp. 3d 264, 273-74

(E.D.N.Y. 2014) (finding $275 a reasonable hourly rate for an attorney who had represented employee benefit plans since 1992). I therefore find the hourly rates for attorney time used in plaintiffs' calculation of attorneys' fees to be reasonable.

In their affirmation in support, plaintiffs identify Jesse Isleman, a former law clerk with plaintiffs' firm. Marimon Decl. ¶ 18. Although the declaration notes that Mr. Isleman is a law school graduate, I infer from his identification as a law clerk that he was not yet admitted to the bar at times relevant to this case. *Id.* Courts in this district have found it unreasonable to charge the same rate for law clerks and associates, even where the work they performed was similar, and have typically found $125 to be a reasonable hourly rate for law clerks not admitted to the bar. *See, e.g.*, *Restivo v. Nassau County*, 2017 WL 3727366, at *9 (E.D.N.Y. August 28, 2017) (finding an hourly rate of $125 reasonable for a law clerk); *D'Annunzio*, 2015 WL 5308094, at *5 (finding $125 a reasonable rate for a law clerk who was "a law school graduate throughout the duration of this action, and performed tasks similar to an associate"); *Gomez v. El Rancho de Andres Carne de Tres Inc.*, 2014 WL 1310296, at *12 (E.D.N.Y. Mar. 11, 2014), *report and recommendation adopted by*, 2014 WL 1310299 (E.D.N.Y. Mar. 31, 2014) (same). Accordingly, I find $125 to be a reasonable hourly rate for work performed by Mr. Isleman.

Plaintiffs also seek fees for the work of five legal assistants at a rate of $100 per hour. In this district, that rate is "slightly higher than is typically awarded for paralegal work," particularly where "plaintiff provides no information regarding the training and background of the assistant[s]." *Gomez*, 2014 WL 1310296, at *12; *see also Ferrara v. All Am. Trucking Servs., Inc.*, 2012 WL 1042936, at *7 (E.D.N.Y. Feb. 17, 2012), *report and recommendation adopted*, 2012 WL 1041840 (E.D.N.Y. Mar. 28, 2012) (collecting cases approving paralegal rates of $90 per hour). *But see Finkel v. Detore Elec. Const. Co.*, 2012 WL 1077796, at *12

(E.D.N.Y. Mar. 6, 2012), *report and recommendation adopted*, 2012 WL 1078470 (E.D.N.Y.

Mar. 30, 2012) (reducing the rate for paralegal hours to $80, because $90 per hour "is slightly

higher than the typical rate in other ERISA default actions"). I therefore find $90 to be a

reasonable hourly rate for plaintiffs' legal assistants.

Applying these amounts and the ten percent reduction described above, plaintiffs are

awarded attorneys' fees as follows:

| Name | Hourly Rate | Hours Billed | Sub-Total |
|---|---|---|---|
| Charles R. Virginia (Partner) | $300.00 | 0.5 | $150.00 |
| Martin C. Fojas (Of Counsel) | $300.00 | 448.8 | $134,640.00 |
| Nicole Marimon (Associate) | $225.00 | 214.8 | $48,330.00 |
| Alison Genova (Associate) | $225.00 | 18.7 | $4,207.50 |
| Claire Vinyard (Associate) | $225.00 | 5.1 | $1,147.50 |
| Adam Biggs (Of Counsel) | $300.00 | 0.3 | $90.00 |
| Jesse Isleman (Law Clerk) | $125.00 | 0.9 | $112.50 |
| Joseph Indelicato (Associate) | $225.00 | 15.4 | $3,465.00 |
| Eva Codispoti (Legal Assistant) | $90.00 | 13.5 | $1,215.00 |
| Liz Fisher (Legal Assistant) | $90.00 | 34.4 | $3,096.00 |
| Christina Isnardi (Legal Assistant) | $90.00 | 0.6 | $54.00 |
| Maura Moosnick(Legal Assistant) | $90.00 | 2.3 | $207.00 |
| Nancy Abreu-Duverge (Legal Assistant) | $90.00 | 0.5 | $45.00 |
| | | Total: | $196,759.50 |
| | | **Total reduced by 10%** | **$177,083.55** |

Plaintiffs also seek reimbursement for $14,310.97 in costs and expenses associated with

this action. Marimon Decl. ¶ 23. "An award of reasonable costs is mandatory in a successful

action to recover delinquent contributions, and courts generally award '[r]easonable and

identifiable out-of-pocket disbursements ordinarily charged to clients.'" *Finkel*, 2012 WL

1077796, at *12 (quoting *Trustees of the Rd. Carriers Local 707 Welfare Fund v. Goldberg*,

2009 WL 3497493, at *10 (E.D.N.Y. Oct. 28, 2009)). But even where a party is entitled to an

award of costs, the burden is on the applicant to "adequately document[] and itemize[e] the costs

requested." *Incredible Foods Grp., LLC v. Unifoods, S.A. De C.V.*, 2016 WL 4179943, at *3 (E.D.N.Y. Aug. 5, 2016) (citation omitted).

Plaintiffs here seek costs associated with legal research, postage, subway fare, taxi fare, deposition transcripts, translations and other similar expenses. Marimon Decl. Ex. A at 12-14, Ex. B at 20-21. These are all within the ambit of costs that are routinely recoverable. *See, e.g.*, *Ferrara*, 2012 WL 1042936, at *9 (citing *Leblanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998)) ("[T]elephone calls, research, ground transportation to Court via subway for filing, photocopying, postage, process service fees and filing fees . . . all serve as a proper basis for reimbursement."). Accordingly, I find plaintiffs' request for reimbursement of the costs itemized reasonable.

## CONCLUSION

For the reasons described above, plaintiffs are awarded damages as follows:

a. $690,624.87 in delinquent contributions;

b. $134,686.93 in liquidated damages,

c. $177,083.55 in attorneys' fees;

d. $14,310.97 in costs; and

e. $8,800 in audit costs.

In addition, I respectfully direct that the Clerk of Court calculate interest on the delinquent contributions at the time the final judgment is entered, and that plaintiffs be awarded

interest on the $690,624.87 in delinquent contributions calculated at a rate of 10% per annum ($189.21 per day) beginning September 30, 2015 and until the date final judgment is entered.

SO ORDERED.

      /s/      
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
January 8, 2018

*U:\#DJM 2017-2018\Trustees of the Mosaic and Terrazzo Wellfare Pension, Annuity, and Vacation Funds, et al. v. High Performance Floors, Inc. et al. 15-CV-2253 (SMG)\Stage II Decision\Stage II Findings of Fact and Conclusions of Law -FINAL.docx*